UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

| | |
|---|---|
| ANTONIO KIRKLAND, JR., as Personal Representative for the ESTATE OF ANTONIO KIRKLAND, on behalf of the Estate and Survivors Amber Kirkland, Antonio Kirkland, Jr., Antavious Kirkland, and SANTOS McGILL,<br><br>     Plaintiffs,<br><br>v.<br><br>RICKY DIXON in his Official Capacity; LT. HECTOR C. VELASQUEZ, SGT. STEPHEN P. BUSIC, OFCR JAKAYE FULLER-WILCOX, PAUL A. PAVESE, JR., in their individual capacities,<br><br>     Defendants. | Case No. 2:21-cv-562-JLB-NPM |

**SECOND AMENDED COMPLAINT FOR
DAMAGES AND INJUNCTIVE RELIEF**

**Introduction**

Plaintiff Santos McGill was forced to share a cell with an untreated emotionally disturbed inmate, Antonio Kirkland, who had suffered the effects of a sexual assault and was mistrustful of strangers. Officers ordered the two share a cell to promote a fight. After McGill was placed in Kirkland's cell, he tried to pacify Kirkland and win his trust. But officers antagonized Kirkland, encouraging him to fight McGill, saying that only one of them could leave the cell alive and, "One of you needs to stop breathing." Plaintiff sues Defendants and alleges:

1

## Jurisdiction and Venue

1. Plaintiff's claim for relief is based on 42 U.S.C. § 1983, 1985, and state law claims. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

3. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202 and Fed.R.Civ.P. 57, and injunctive relief is authorized by Fed.R.Civ.P. 65.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as some of the events sued upon occurred in this judicial district.

5. All conditions precedent to this action have been performed or waived.

## Parties

6. Plaintiff, ANTONIO KIRKLAND, JR., is a son of Decedent Antonio Kirkland and the Personal Representative of the Estate of Antonio Kirkland, suing on behalf of the Estate and Survivors Amber Kirkland, Antonio Kirkland, Jr., and Antavious Kirkland.

7. Plaintiff SANTOS McGILL is a prisoner in the Florida Department of Corrections and a witness to the circumstances of the death of Decedent.

8. Defendant RICKY DIXON, in his Official Capacity, leads a state agency charged with operating Florida prisons and the custody of prisoners. He is sued only for injunctive relief and under the ADA and Rehabilitation Act.

9. At all times material hereto, Defendant LT. HECTOR C. VELASQUEZ was an Officer at Charlotte C.I. He is sued individually.

10. At all times material hereto, Defendant SGT. STEPHEN P. BUSIC, was an Officer at Charlotte C.I. He is sued individually.

11. At all times material hereto, Defendant JAKAYE FULLER-WILCOX, was a Corrections Officer or Trainee at Charlotte C.I. He is sued individually.

12. At all times material hereto, Defendant PAUL A. PAVESE, JR., was an Officer at Charlotte C.I. He is sued individually.

13. Defendants acted under the color of law but outside the course and scope of their employment, pursuing private and criminal purposes.

## Common Allegations of Fact

14. In July of 2017, Decedent Antonio Kirkland (Kirkland") was an inmate in the custody of the Florida Department of Corrections (FDC).

15. On or about July 7, 2017, Prison officials ordered Kirkland to accept a cellmate; he refused, asserting he was raped and feared having a cellmate.

16. The intended cellmate, Santos McGill also didn't want to be placed in the cell with Kirkland and believed that Mr. Kirkland was in a dangerous and volatile mental state, but he was forced by the officers to share the cell with Kirkland.

17. Kirkland told McGill that six officers had held him down and a corrections trainee, Jakaye Fuller-Wilcox (Fuller), sprayed pepper spray in his rectum.

3

### A. "Gladiator School" Session in Administrative Segregation Dorm A

18. Fuller and other corrections staff antagonized Kirkland, threatening him to get him to fight McGill to the death apparently for their entertainment.

19. Charlotte Correctional Institution was a particularly brutal camp. An inmate, Matthew Walker, had been beaten to death by officers three years earlier.

20. Inmates had reasons to be afraid of the corrections staff at Charlotte C.I.

21. Leading up to the incident, Defendant Fuller told Plaintiff McGill that "you have our permission to do anything you want to Inmate Kirkland."

22. Inmate McGill protested, "I only got a week. I don't want any problems."

23. Forcing inmates to fight each other for sport, "Fight Club" or "Gladiator School" was a common practice in the Florida Department of Corrections,

24. The practice of forcing inmates to fight each other was well known to the Warden, Chief of Security, and prison administrators throughout the system.

25. Corrections staff at Charlotte C.I. and other Florida prisons used a combination of bribes and threats to get inmates to fight each other.

26. For two or three days, Kirkland and McGill lived together in peace.

27. On July 10, 2017, prison staff stepped up their campaign to instigate a fight between the two inmates while McGill tried to keep Kirkland cool.

28. Corrections staff called, out, "Only one of you is coming out." "One of you needs to stop breathing." And "One of you needs to kill the other."

29. No staff present sought to intervene to prevent the abuse although able.

30. At the urging of the staff, Kirkland tried to claw McGill's eyes out.

31. Other officers came up and encouraged the two inmates to fight.

32. Kirkland was clearly traumatized by the earlier abuse and appeared to succumb to the officers' insinuations that McGill was there to kill him.

33. Kirkland talked about his family and started to cry.

34. Kirkland began to hit McGill and McGill restrained him in a bear hug.

### B. Corrections Staff Saturate the Cell with "Sabre Red" Pepper Spray

35. Normally when inmates fight, pepper spray is a temporary expedient.

36. In only a few minutes a cell extraction team can suit up and enter the cell in tight formation fronted by a man with a plexiglass shield.

37. If officers have time, they can check with medical to see if either of the inmates have breathing problems and call for a hand-held camera.

38. In fact, Kirkland suffered from asthma. But none of that was done.

39. Defendant officers emptied can after can of high potency, highly pressurized chemical agents known as "Sabre Red" on the two inmates.

40. Sabre Red is one of the most powerful pepper sprays on the market.

41. Normally, deployment of pepper spray means three one-second bursts. A can of Sabre Red held about 40 bursts. Officers used 4-8 cans that day.

42. Officer Paul Pavese and Trainee Fuller sprayed inside the cell liberally.

43. Dorm Sgt. Steven Busic emptied multiple cans of Sabre Red.

44. Throughout the repeated deployment of high-strength chemical agents, McGill tried to restrain Kirkland from attacking him.

45. Despite Mr. Kirkland's obviously disturbed mental state, none of the officers attempted to summon medical or mental health providers to the cell.

46. McGill begged the officers for help, telling them he was afraid for his life.

47. Initially there was no effort to call for a hand-held camera which is used, when possible, during a use of force, there were cameras affixed to the wall.

48. Officers went through the motions of ordering the two men to stop fighting.

49. At least 33 minutes elapsed without a medical team or a cell extraction team coming to the scene. Over 20 minutes was spent yelling or spraying gas.

50. Neither Kirkland or McGill could break off the fight – Kirkland because he thought McGill wanted to kill him; McGill because he feared Kirkland.

51. Finally, Kirkland crawled to the door and sat with his back against the door, breathing heavily. Officers sprayed down through the food slot.

52. By now, a Colonel and Major and numerous officers were at the cell.

53. No officer or administrator sought to prevent the abuse, though able.

54. Kirkland ceased moving. McGill got off the top bunk where he went for safety and held Kirkland's hands up to the food slot to be cuffed.

55. After sustained physical abuse, officers finally took McGill to the shower.

56. Witnesses said Kirkland fell off the stretcher and appeared to be dead.

57. On July 10, 2017, at approximately 4:29 p.m., Inmate Antonio Kirkland was pronounced deceased at Charlotte Correctional Institution.

58. Corrections and medical staff long ignored Kirkland's need for medical and mental health care exposing Kirkland to undue suffering and risk of death.

59. Corrections and medical staff targeted disabled and mentally ill prisoners because they were hard to manage and caused them extra work.

60. At the time of the incident, Kirkland was clearly recognizable as a disabled adult suffering from obvious but untreated mental illness.

61. 'Disabled adult' means a person 18 years of age or older who suffers from a condition of physical or mental incapacitation due to a developmental disability, organic brain damage, or mental illness, or who has one or more physical or mental limitations that restrict the person's ability to perform the normal activities of daily living. § 825.101(3), Fla. Stat.

62. Medical providers were aware of his serious mental health condition but failed to provide timely or adequate treatment or monitoring.

**C. Aftermath of the Death of Antonio Kirkland**

63. After the event, prison supervisors, including Col. Johnny Morales, were anxious to get Inmate McGill to sign off on the official version of events.

64. The "white shirts" (administrators) came to McGill's cell and told him he

needed to sign a version of the incident that would clear the officers.

65. One administrator called McGill "motherfucker" and said, "You're going to write this" (a statement exculpating the Defendant officers at the scene).

66. McGill refused to write anything. The officers present threatened to move him far away from his family. Officers tried to plant a knife on him.

**D. Retaliation Followed Inmate McGill through a Series of Camps**

67. Plaintiff McGill had been at Charlotte C.I. for more than a year and a half.

68. Over the year after the incident, he was moved six times:

    a) On 08-08-17, he was transferred to South Florida Reception Center;

    b) Two days later, he was transferred Central Florida Reception Center;

    c) On 08-15-17, he was transferred to the Reception and Medical Center;

    d) On 08-21-17, he was transferred to Taylor Correctional Institution;

    e) On 08-25-17, he was transferred to Columbia Annex;

    f) On 09-13-17, he was transferred to Florida State Prison.

69. McGill only had one single minor Disciplinary Report (DR) during the 18 months he had been at Charlotte C.I. before his cellmate's death.

70. In the 18 months following his refusal to sign a statement exculpating the Charlotte C.I. officers over Inmate Kirkland's death, he received nine DR's.

71. When he was moved from Charlotte C.I., McGill was placed in confinement and had retaliatory force used on him at the South Florida Reception Center.

72. There was an attempt to move McGill to Tomoka C.I., but they refused to let

him get off the van; subsequently he was taken to Taylor C.I.

73. A "white shirt" told McGill "I don't know what you have going on but we want you away from here." Soon he was transferred to Columbia Annex.

74. At Columbia Annex, McGill was called to medical as a ploy. Officers there put on black gloves and took him where there were no cameras.

75. They told him, "You're a problem at other institutions. We know you're a fucking snitch. Strip down to your boxers. You know what's going on."

76. The officers then sprayed him with chemical agents and beat him extensively, causing visible bruising and injuries to his face and body.

77. A Sgt. named Walker asked him what he told the FBI, and added, "A couple of my friends got in trouble. I'll kick your ass about it."

78. An inmate named Frank told him he was asked by officers "to fuck you up." "Frank," didn't do anything to harm McGill because they realized they had mutual acquaintances, and Frank was then moved out of the cell.

79. The next day, Santos McGill found glass in his food.

80. For a time, Santos McGill was not bothered by officers until he got a letter from Attorney Myers about Kirkland. Then he was sent to Suwannee C.I., which is prominently used as a "retaliation" camp.

### E. Florida's History of Inmate Deaths

81. Antonio Kirkland was just one of 481 inmates who died between July 1,

2017 and June 31 2018, up 26 percent from the year before.

82. Deaths in the Florida Department of Corrections have been going up even as the number of inmates in Florida prisons have been going down.

83. The number of deaths in FDC prisons was higher in 2017/2018 than in any year prior to the current pandemic year.

84. Inmate homicides have been a systemic issue according to statistics compiled by the Florida Department of Corrections. From the time period 2011 to 2014, there have been a total of at least 32 inmate deaths that were determined to be homicides by the Medical Examiner.

85. Prison administrators knew of excessive force and abuse, of inmates through daily reports and long-term death and injury statistics.

86. Although Antonio Kirkland's death was classified as "accidental," there is every reason to believe that it was really a homicide.

87. Data compiled by the Florida Department of Corrections show ten male homicides in Florida's correctional institutions in the year of 2011.

88. Data compiled by the Florida Department of Corrections, show six male homicides in Florida's correctional institutions in the year of 2012.

89. Data compiled by the Florida Department of Corrections show seven male homicides in Florida's correctional institutions in the year of 2013.

90. Data compiled by the Florida Department of Corrections show eleven male

homicides in Florida's correctional institutions in the year of 2014.

91. Just a few years prior to Antonio Kirkland's death at Charlotte C.I., another Charlotte C.I. inmate, Matthew Walker, was beaten to death by officers.

92. Before and since this incident, Defendants have cooperated to permit:

   a) cover-ups involving reporting breaches and erasing evidence;

   b) failure to report or accurately report use of force details;

   c) failure to timely summon video cameras for uses of force;

   d) failure to timely summon medical care;

   e) failure to inquire about special medical problems when using gas;

   f) suppression of or undue influence on use of force investigations;

   g) failure to document or preserve evidence;

   h) failure to punish abuses, false reports, or rule violations once discovered.

93. Defendants were aware their administrative and supervisory practices were substantially certain to cause the kind of harm suffered by Kirkland.

94. The Defendants' conduct herein, including but not limited to their decision to "teach lessons" to difficult inmates and to reward and promote violent abusive officers proximately caused the damages to Plaintiff.

95. Defendants each acted to violate Antonio Kirkland's constitutional rights or failed to intervene to prevent the violation of his rights, though able.

96. Defendants interfered with timely medical treatment to save Antonio Kirkland's life or failed to intervene to prevent interference, though able.

97. Defendants acted collectively and jointly to violate Kirkland's rights.

98. Defendants acted with specific intent to harm Kirkland and did so.

99. Defendants reached an implicit or explicit understanding and:

    a) Agreed to commit and to stand silent and acquiesce in acts which resulted in the severe physical injury and death of Antonio Kirkland;

    b) Agreed to observe the Code of Silence and cover each other which is the meaning of the FDC motto, "We Never Walk Alone."

    c) Agreed to delay medical treatment to Kirkland, though unresponsive;

    d) Agreed to hide and destroy and alter evidence, to engage prisoners and others to help hide, destroy, and cover up evidence and remain silent;

    e) Agreed to coordinate their accounts of the use of force to minimize inconsistencies, to encourage strategic lack of knowledge or memory;

    f) Agreed to give false and misleading statements to investigators and continue misinformation for years after their criminal actions;

100. In so doing, Defendants pursued their own, independent criminal interests which were inconsistent with the interests of their agency.

101. Decedent, Antonio Kirkland's death was a direct and proximate result of Defendants collective wrongful acts under color of law.

## Causes of Action

### I. 42 U.S.C. § 1983 Failure to Protect (Ricky Dixon, Injunctive Relief)

102. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

103. Plaintiff is entitled to declaratory and injunctive relief against Defendant Dixon in his official capacity, for a systemic failure, through his agents and employees ("staff") to protect Plaintiff from threats and retaliation in

violation of the First and Eighth Amendment to the U.S. Constitution, as further set out in the Common Allegations of Fact, and as follows:

a. Florida Department of Corrections officers have a tradition of setting up fights between inmates, despite their unwillingness, including fights to the death, called, "Fight Club" or "Gladiator School" for officers' amusement and sometimes bets are placed on the inmate combatants.

b. Since being forced into conflict with Decedent Antonio Kirkland, in a "Fight Club" scenario, Plaintiff McGill has been labeled a "snitch" and subject to threats of physical violence and actual physical violence by corrections employees for refusing to retract his truthful testimony.

c. The campaign of threats and violence which began at Charlotte C.I. has continued through several transfers without abating and is currently being administered at Suwannee Correctional Institution.

d. Plaintiff is currently being housed at Suwannee Correctional Institution which is a harsh and inhumane prison that is used to punish inmates who complain about unfairness and brutality at Florida prisons.

e. Plaintiff McGill has been threatened with beatings and death and has actually suffered beatings for refusing to lie about the physical abuse of himself and the abuse and death of his cellmate Antonio Kirkland.

f. Prior Secretary Inch was aware of the problem of retaliation and issued a sternly-worded memorandum on retaliation to corrections employees but has failed to take the necessary actions to enforce his commands.

g. The Uniform Commitment Order by which prisoners are committed to the Florida Department of Corrections orders the keepers of Florida prisoners to "safely keep" the prisoners and states, "Herein fail not."

104. Secretary Dixon has a non-delegable duty to protect Florida prison inmates.

105. As a proximate result of denial of protection, Plaintiff McGill has suffered irreparable harm, including physical injury, mental distress, humiliation, as set forth in Sections C and D above, and he will continue to suffer such

13

injuries in the future unless relief is granted.

106. Plaintiff submits that he has a strong chance of success and the relief sought is narrowly drawn and consistent with the public interest.

107. As it was necessary for Plaintiff to retain the undersigned attorney to represent him, Plaintiff is entitled to an award of attorneys' fees and costs.

WHEREFORE, Plaintiff seeks relief as noted below.

## II. 42 U.S.C. § 1983 Failure to Protect (Velasquez, Busic, Fuller, and Pavese, for Compensatory and Punitive Damages)

108. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

109. Plaintiffs are entitled to relief as to Velasquez, Busic, Fuller, and Pavese for failure to protect them from the abuse of McGill and the death of Kirkland.

110. The aforementioned parties participated in acts that placed McGill and Kirkland at risk and caused Kirkland's death, as follows:

   a) Setting up fights between the Plaintiffs, despite their unwillingness, including fights to the death, for the above Defendants' amusement.

   b) Taking advantage of Inmate Kirkland's mental health impairment to convince him that Inmate McGill wanted to kill him.

   c) Failing to call medical to come to Plaintiffs' aid and failing to inquire about medical problems with gas prior to continuing deployment.

   d) Failing to call a cell extraction team for a hands-on removal of the two inmates from the cell and protection of each of them.

111. As a proximate result of denial of protection, Plaintiffs have suffered irreparable harm, including physical injury, mental distress, humiliation,

and, as to Inmate Kirkland, death, as further set forth in Sections A and B above, and Plaintiff McGill and the Survivors of Decedent Kirkland, will continue to suffer injuries in the future.

112. As it was necessary for Plaintiff to retain the undersigned attorney to represent him, Plaintiff is entitled to an award of attorneys' fees and costs. WHEREFORE, Plaintiff seeks relief as noted below.

### III. 42 U.S.C. § 1983: Excessive Use of Force/Failure to Intervene (Velasquez, Busic, Fuller-Wilcox, and Pavese)

113. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

114. Plaintiff is entitled to relief against Velasquez, Busic, Fuller-Wilcox, and Pavese, for violation of the Eighth Amendment to the U.S. Constitution and failing to intervene to prevent harm to Plaintiffs, though able.

115. The aforesaid Defendants, while acting under color of state law and by virtue of the authority vested in them by the State of Florida or its subdivisions or agencies, unlawfully and without justification jointly and severally violated the Eighth Amendment when Defendants:

   a) Created the circumstances in which Inmates McGill and Kirkland were forced to fight each other;

   b) Had actual knowledge that officers planned to physically assault, harass, attack, and cause harm, not excepting death, to McGill and Kirkland;

   c) Subjected McGill and Kirkland to round after round of chemical agents, ultimately causing or contributing to McGill's untimely death;

   d) Failed to secure timely medical attention to Kirkland while pretending

15

      that he was not seriously injured; or

   e) Becoming aware of the severe physical abuse of McGill and Kirkland, and failing to intervene to stop the abuse, though able.

116. As a direct result of the above-described excessive use of deadly force failure to intervene in the abuse of McGill and Kirkland, as further described in Sections A and B above, McGill and Kirkland experienced fear and mental distress and brutal and severe physical injuries resulting in McGill's physical pain and Kirkland's untimely death.

117. As Plaintiffs are obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, they are entitled to reasonable attorney fees as well as costs. WHEREFORE, Plaintiff seeks damages as noted below.

## IV. 42 U.S.C. § 1983: Deliberate Indifference (Velasquez)

118. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

119. Plaintiffs are entitled to relief against Defendant supervisor Velasquez, for deliberate indifference to violation of the Eighth Amendment.

120. Prior to July 13, 2017, aforementioned Defendant evinced deliberate indifference to constitutional rights of inmates, which ultimately caused the violation of Decedent, Mr. Kirkland's constitutional rights and his death.

121. Prior to July 13, 2017, the Defendant acted as a supervisor on the scene, present at and aware of his subordinate correctional officers' excessive force against Inmates McGill and Kirkland and acts to cause them physical injury.

16

122. Velasques performed, caused, planned, encouraged, condoned, or acquiesced in acts of excessive force and made such acts certain to occur.

123. As a direct, proximate, and foreseeable result of the Defendant's deliberate indifference, as further described in Sections A and B above, Mr. McGill suffered mental distress and physical harm and Mr. Kirkland suffered severe physical injuries, severe pain, mental distress, fear, and death.

124. As Plaintiffs are obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, they are entitled to reasonable attorney fees as well as costs.

WHEREFORE, Plaintiff seeks damages as noted below.

## V. Conspiracy under 42 U.S.C. 1983 to Violate the Eighth Amendment (Velasquez, Busic, Fuller-Wilcox, Pavese)

125. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

126. Plaintiffs are entitled to relief against Defendants Velasquez, Busic, Fuller-Wilcox, Pavese, for violation of the right against excessive force.

127. Defendants acted under color of law to further the conspiracy.

128. All the above Defendants committed overt acts to achieve a criminal purpose and were otherwise willing participants in collective acts to violate rights.

129. Defendants cooperated in a plan to deceive Inmate Kirkland about the intentions of Inmate McGill to cause the two inmates to fight and endanger each other's lives for their amusement as set out in Section A above.

130. Defendants cooperated in a plan not to alert medical or the cell extraction

team for a substantial period so as to have free rein to use large quantities of powerful chemical agents against Inmates McGill and Kirkland, ultimately causing the death of Inmate Kirkland as set out in Section B above.

131. As a direct result of Defendants' conspiracy to deprive Mr. Kirkland of his constitutional rights, he suffered severe physical injuries and death.

132. To further the conspiracy, all co-conspirators committed overt unlawful acts and were otherwise willful participants in collective acts to violate rights.

133. As a direct result of the above-described conspiracy in aid of excessive deadly force on Santos McGill and Antonio Kirkland, both sustained brutal and severe physical injuries resulting in Kirkland's untimely death or alternatively, caused intense pre-death suffering.

134. As Plaintiffs are obliged to retain counsel for redress, pursuant to 42 U.S.C. 1988, they are entitled to reasonable attorney fees as well as costs. WHEREFORE, Plaintiff seeks damages as noted below.

## VI.   Action for Pre-Death Damages under Florida Survival Statute

135. Plaintiffs re-allege the Common Allegations as if fully set forth herein.

136. Plaintiff Kirkland is entitled to relief against Defendants Velasquez, Busic, Fuller-Wilcox, and Pavese, pursuant to § 46.021, Fla.Stat., for acts and/or omissions causing injury to Decedent but not contributing to his death.

137. To the extent any Defendant's wrongful acts are found not to have caused

the death of Antonio Kirkland, those acts give rise to pre-death damages for the physical pain and mental distress caused by those wrongful acts.

138. As a result of Defendants' wrongful acts, Antonio Kirkland suffered great fear and mental anguish; humiliation; disability; aggravation of an existing condition; loss of enjoyment of life; physical pain due to abusive treatment; all other injuries caused by Defendants' wrongful acts other than those that actually caused Decedent's death.

WHEREFORE, Plaintiff prays for judgment as noted below.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests of the Court:

A. Declaratory and Injunctive Relief to the extent of taking action to discontinue and prohibit ongoing threats and extraordinary treatment having the effect of chilling the exercise of privileged speech.

B. Compensatory damages in an amount to be determined, including damages to the Estate and to the Survivors of Antonio Kirkland for their own mental pain and suffering and other losses and to Santos McGill for physical injury and mental pain and suffering;

C. Punitive damages against the individual defendants for their malicious and unconscionable actions depriving both Santos McGill and Antonio Kirkland of their rights and Mr. Kirkland of his life;

D. Reasonable attorney's fees and costs under 42 U.S.C. § 1988;

E. Trial by jury on all counts so triable; and

F. Any further relief this Court deems just and proper.

Respectfully submitted on 2/7/22,   *s/ James V. Cook*
JAMES V. COOK, ESQ.
Florida Bar Number 0966843

        Law Office of James Cook
        314 West Jefferson Street
        Tallahassee, Florida 32301
        (850) 222-8080; 561-0836 fax
        cookjv@gmail.com

        *s/ Cynthia A. Myers*
        Cynthia A. Myers, Esq.
        Fla. Bar No. 147397
        Cynthia A. Myers, PA
        PO Box 15011
        Tallahassee, FL 32308
        850/322-1124
        cindy@cindymyerslaw.com

        ATTORNEY FOR PLAINTIFFS

I CERTIFY the foregoing was filed electronically on 2/7/22, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

        */s/James Cook*