### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

ANTONIO KIRKLAND, JR., et al.,

      Plaintiffs,

v.

RICKY DIXON in his Official Capacity; et al.,

      Defendants.

Case No. 2:21-cv-562-JLB-NPM

### PLAINTIFF'S MOTION PURSUANT TO FED.R.CIV.P. 56(d)
### AND FOR SANCTIONS UNDER RULE 26(g)

Plaintiffs ANTONIO KIRKLAND, JR., and SANTOS McGILL, through counsel, pursuant to Fed.R.Civ.P. 56(d), Federal Rules of Civil Procedure, moves this Court to deny or defer ruling on the Defendants' Summary Judgment Motion (D.E. 77) until such time as certain critical evidence has been produced in full to Plaintiff or for *in-camera* inspection by the Court, and would show as follows:

**A. Issues Arising from the July 3, 2017, Use of Force on Antonio Kirkland**

1.   Defendants' Statements of Fact and argument rely heavily on denials that Decedent Kirkland had been sprayed in the rectum with chemical agents[1] prior to his death, dismissing it as an "utter fabrication" and that "none of the four defendants" were at work on July 3, 2017, and other dates. (D.E. 77 at 3).

2.   On October 13, 2022, 18 days before the end of discovery, Defendants

---

[1] Defendants quote McGill as saying, "*around* and in his rectum," as if the location of the spray could have been accidental. But review of the Florida Department of Law Enforcement (FDLE) audio interview with McGill shows the statement was "Somebody pulled off his pants and sprayed him with gas on his ass." (D.E. 77-3 at 16:01 (mm:ss), INV-30, Audio Interview with Santos McGill).

1

produced a July 3, 2017, use of force report that had been left out of the classification file requested months earlier. The folder also included two corresponding use of force videos[2] which have now been closely reviewed and a transcription made. (Exh. 2, Transcripts of 7-3-2017 Videos).

3.  In the course of reviewing the hand-held camera video of the July 3, 2017, event, it becomes very clear that Defendant Hector Velasquez *was* at work on July 3, 2017, and that Velasquez participated in the Kirkland incident.

4.   At the same time the Daily Security Roster shows Lt. Hector Velasquez having the day off July 3, it also shows him assigned to supervise C Dorm. (D.E. 77-3 at 28, 29). But whatever the Roster says, it is clear that the Lt. Hector C. Velasquez on the video is the very same Defendant Lt. Hector C. Velasquez supervising A Dorm the day Antonio Kirkland, Sr. died.

5.  Moreover, throughout the nearly 90-minute decontamination shower that Kirkland is allowed – far longer than normal – as captured on video, Lt. Velasquez attempts to engage Kirkland in a conversation about his Prison Rape Elimination Act (PREA) complaint against Sgt. Lester McDaris (now a Lieutenant) at Cross City Correctional Institution. At 42:00, Velasquez says:

Velasquez: Listen, we're trying – I've been trying to talk to you this whole time. You don't get anywhere screaming. This is what it is. We understand you're protected. They did their job. And what did you do? . . . What did you do to (unintelligible), just so I know.

---

[2] The videos did not include the actual use of force, but just the aftermath, the escort to medical and to the decontamination shower which lasted about 90 minutes total.

(Exh. 2 at 42:00) Velasquez goes on to say something about the Office of Inspector General and Kirkland responds that the matter is still being investigated. Much of what is said is hard to understand and Plaintiffs are seeking an expert on audio restoration to render the voices clearly.

6. Kirkland is also talking about prison officials sending gang members to attack him because he made the PREA complaint. At around 07:30 on video MVI_1723 Kirkland says that as a result of his PREA report, "The police went and put a hit out on me with the gangs." At around 51:30 on Kirkland says a gang member was placed in his cell and "he crossed me" and that "they were working together."  (Exh. 2, MVI_1723 Transcript, at 07:30, 51:30).

7. All of this, together with the nervousness and comments of Lt. Velasquez during the 90-minute shower, foreshadows the events of July 10, 2017, a week later and helps establish a basis of trustworthiness when Plaintiff McGill says Kirkland complained of being sprayed in the rectum with chemical agents, the resistance of Kirkland to having a cell-mate, and his belief that he was marked for death at McGill's hands. (88-9, Composite Exhibit Video).

8. Also relying on the now questionable authority of the Daily Security Roster, Defendants maintain that none of the Defendants were present on July 7, 8, or 9, the presumptive days from the celling of the two inmates together to the date of Kirkland's death. But Officer John Dischiavo was present on July 3 (assisting with the Kirkland use of force), July 6 (D.E. 77-3 at 72), July 7 (Id. at 86, 88), July 8 (Id. at 100, 102, 104) and July 9 (Id. at 114), showing up on

the roster with his name misspelled "Dichiavio" on July 8 (Id. at 107).

9. Lt. Ezri Rediker, who handed the use of force case off to Lt. Velasquez, worked on July 3, 2017, as shift supervisor (Id. at 28, 31), as well as July 10 (Id. at 129). Fausto Rosario, who was present with Lt. Velasquez through the 90-minute shower, was present on July 3, 2017 (Id. at 29, 32, 36), and was a Dorm Officer in Dorm A, where Kirkland was housed, on July 7, when McGill was brought in to be celled with him (Id. at 86, 88, 92).[3] Rosario was also working Dorm A on July 8 (Id. at 108), and July 9 (Id. at 122).

10. Dalton Loar, who operated the camera for Lt. Velasquez on July 3, 2017, was also on duty on July 7 (Id. at 87) and July 8 (Id. at 101). Officer Loar was documented on the Daily Security Roster as having the day off on July 10, 2017 (Id. at 129), the day of Kirkland's death, but, according to the FDLE Investigation Report, Loar was certainly at work on July 10 and was interviewed by the FDLE Special Agents on that date. (D.E. 88-4 at 3, 5).

11. So, the Daily Security Roster is demonstrated not to be a reliable authority as to who was working on the date Kirkland claimed to have had chemical agents applied to his rectum or on the date of Kirkland's death. Further, persons who worked with Defendant Velasquez on the date of the incident by which Kirkland was placed in confinement and the use of force that was the

---

[3] The Sergeant for Dorm A on July 7, 2017, was Bennett Heffner. The Officers were Fausto Rosario and James McAllister. They would have been on duty when McGill was first brought to the cell and pressured to enter it. (D.E. 77-3 at 86)

basis of Kirkland's allegations of abuse were working on the date Kirkland and McGill were first celled together and the days prior to Kirkland's death.[4]

12.   If Plaintiffs had received the records that were requested early in discovery but finally sent on October 13, 2022, just days before the end of discovery, there would have been an opportunity to investigate the relationship of several other corrections employees to the series of events leading to Kirkland's death.

**B.   Issues Arising from Defendants' Responses or Non-Responses to Discovery**

13.   In responding to Plaintiff's Compel Motion, Defendants claimed but did not demonstrate that one of Plaintiffs' Interrogatories had "discrete subparts" that put total interrogatories over the 25 interrogatory mark permitted by the rules.

14.   Apparently, Defendants chose to regard Plaintiffs' Second Interrogatories, Interrogatory 2, as constituting three discrete Interrogatories. Interrogatory 2 asked whether the FDC computer system gauging inmate compatibility contained (a) medical records; (b) mental health records; and (c) protective management records and, as to each, if not, why not. (D.E. 72-1 at 5). However, clearly the subparts were logically related to the primary question and thus do not constitute discrete subparts. (*See authority in Memorandum*).

15.   Based on their theory that the above constituted three Interrogatories rather than one, Defendants refused to answer the last two Interrogatories, 6 and 7,

---

[4] Defendants urgently insist that Plaintiff McGill identified the Defendants in this case as the officers who forced them into the cell together. That is just not true. Plaintiffs were only able to identify the Defendants through the FDLE investigation report. Clearly, many more prison officials could be part of this lawsuit, but Plaintiffs did not know their identities prior to the running of the statute of limitations.

in Plaintiff McGill's Third Interrogatories served on September 30, to wit:

6.  Please explain why, in the records produced by you on March 4, 2022, there are no incident reports or disciplinary reports in Antonio Kirkland's classification file for the July 3, 2017, Use of Force or relating to his confinement on 1/22/17, 2/8/17, 4/11/17, Or 7/9/17, and explain why there is no MINS report relating to the July 3, 2017, use of force incident.

7.  Please describe the protocol for placing two inmates in the same cell, the compatibility factors considered for the placement of inmates McGill and Kirkland in the same cell, and the availability of other placement options for Mr. McGill on the date he was placed in the same cell with Antonio Kirkland in July of 2017.

16. To be fair, though Defendants refused to answer these questions on October 28, 2022, they had finally produced the missing records 15 days earlier on October 13, 2022, with the July 3, 2017, hand-held videos and Use of Force Report 17-11829. But they sidestepped the question why the records were not produced more than seven months earlier and what factors dictated the celling together of the two unwilling inmates. Plaintiffs still seek those answers.

17. Those responses are all the more important because the Dorm Logs that would normally describe events that occurred on July 7, 2017, when the two inmates were forced to be housed together, had been destroyed in early 2020, nearly six months before the regulations permitted destruction. (D.E. 70-2).

18. Dorm Logs are logs of every routine and every unusual event during each shift of each Dormitory and all its wings. Plaintiffs requested Dorm Logs from June 27, 2017, through July 11, 2017. Initially, Defendants responded that the logs would be provided. Later, it was revealed that the Dorm Logs had been destroyed even earlier than permitted by a three-year purge schedule.

19. The undersigned attorney has handled many inmate death cases and will certify in the accompanying declaration (Exh. 1) that he has never known Dorm Logs to be destroyed in a death case. He will also certify that FDLE officials claim the Logs were never turned over to them.

20. With their response to Plaintiffs' Motion to Compel, Defendants provide an FDC Records Disposition Document (D.E. 72-3) that indicates that Housing Logs for Dorm A in this case were destroyed on January 23, 2020 – nearly six months earlier than the statutory purge date would have allowed.

21. The Dorm Logs would have shown every cell block security check by the Officers in A Dorm, including Sgt. Busic and Officers Pavese and Fuller. They would have detailed any irregularity with the celling of two unwilling cellmates on July 7, 2017. They would have shown the Dorm count and revealed whether there were open beds in other cells where McGill could be placed. And perhaps they would have shown why Defendants, including the Secretary, were in such a rush to destroy the Dorm Logs before the purge date.

C. **Failure to Provide Records Relating to McGill's Claims of Retaliation**

22. After his transfer from Charlotte, Plaintiff McGill went through a maelstrom of uses of force, threats, and disciplinary charges, including numerous drug charges. (D.E. 88-1, McGill Deposition, at 113:1-115:3; 130:6-135:19; 141:7-145:20; 146:17-149:18). Defendants claim that any drug tests, whether positive or negative, were or would be provided to Plaintiffs. None have been, although some of McGill's Disciplinary convictions for drug use indicate that

the drug test had been "negative." Video from a use of force on Plaintiff
McGill at Columbia Annex shortly after threats of retaliation had been made
against him, was never provided although Defendants state that it had been
requested and would be provided as soon as received. (D.E. 72 at 5). It is
reasonable to assume that FDC records ordered by the Secretary of the
Department of Corrections would be more quickly provided.

**D. Unjustified Redaction of Information in Incident Reports**

8.  Since demanding Management Information Notification System (MINS)
    incident reports that cover virtually every reportable event, without heavy
    redaction in narrative sections, counsel for Plaintiffs was told the Office of
    Inspector General simply refuses to comply. It is unfair to say, as Defendants
    do, that Plaintiffs believe "they can dictate the terms of redaction." (D.E. 72 at
    6). Plaintiffs do believe that records should be provided unredacted to
    Plaintiffs counsel on terms that prevent or limit dissemination, or in special
    cases, to be provided unredacted to the Court for *in camera* review.

9.  Although there is information that should be redacted prior to filing under
    Fed.R.Civ.P. 5.2(a), most of the redactions are in no way privileged and
    should be produced by Defendants without unjustified redactions. Redactions
    of public records like all efforts to withhold information should have to be
    justified under the "good cause" standard of Fed.R.Civ.P. 26(c)(1).

10. For these reasons and others, Plaintiff seeks attorney's fees as sanctions under
    Rules 26(g) for defense concealment of evidence.

8

## MEMORANDUM OF LAW

Rule 56(d), Federal Rules of Civil Procedure, provides:

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

>    (1) defer considering the motion or deny it;

>    (2) allow time to obtain affidavits or declarations or to take discovery; or

>    (3) issue any other appropriate order.

Rule 56(d) expressly provides that the Court may deny a motion for summary judgment if a non-movant shows by affidavit that "it cannot present essential facts to justify its opposition." *Grey Oaks Country Club, Inc. v. Zurich Am. Ins. Co.*, No. 2:18-cv-639-FtM-99NPM, at *8-9 (M.D. Fla. Nov. 7, 2019) (quoting Fed. R. Civ. P. 56(d)). Plaintiff bears the burden of alerting the Court to missing and conflicting evidence. Counsel's declaration, attached as Exhibit 1, is provided to make that showing.

Entry of summary judgment before the nonmoving party has time to fully conduct discovery constitutes reversible error. *WSB-TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir. 1988); *Jones v. City of Columbus, Ga.*, 120 F.3d 248, 253 (11th Cir. 1997) (summary judgment may only be decided upon an adequate record).

### A. Defendants' Steadfast Denial that Any Defendant Was at Work and Involved in the July 3, 2017, Use of Force on Kirkland Was Patently False

Defendants staked a great deal of credibility on their denial that any Defendants were present at Charlotte C.I. on the critical days prior to the death of Antonio Kirkland: July 3, 7, 8 and 9. But just days before the end of discovery, Defendants belatedly produced a video from July 3, 2017, showing not only that

Defendant Lt. Hector Velasquez *was* at work on July 3, 2017, but that he was integrally involved in the events that led to the placement of Antonio Kirkland in Administrative Confinement in Dorm A on that date. Further, the accompanying audio provides an intriguing conversation between Velasquez and Kirkland about a Prison Rape Elimination Act (PREA) complaint by Kirkland against Sgt. McDaris (now Lieutenant) at Cross City Correctional Institution, where Kirkland had been housed before coming to Charlotte. The conversation is hard to make out in parts but there are clear references to the Office of Inspector General and "protection" that was being provided to Kirkland apparently relating to the PREA investigation.

### B. Mischaracterizing an Interrogatory as Having Multiple Discrete Subparts Allowed Defendants to Sidestep Important Questions on Withheld Records

As noted, Defendants avoid answering two important Interrogatories by arguing that an earlier interrogatory had three "discrete subparts." See *Gagnon v. Fla. 595 Travel Ctr. Corp.*, No. 15-62380-CIV-COHN/SELTZER, at *3 (S.D. Fla. Aug. 23, 2016) (Subject matters in an interrogatory that are logically related to the primary question do not constitute discrete subparts.).

By this means of refusing to answer the last two Interrogatories propounded by Plaintiff McGill, Defendants – although they did ultimately provide the July 3, 2017 Use of Force Report and corresponding videos – were able to sidestep the question why the evidence was not provided as part of the classification file requested months earlier. They were also spared having to give the requested detailed description of how the inmate compatibility process worked and why McGill and

Kirkland were forced to cell together despite the fact that neither of them wanted to.

This was all the more critical because Defendant FDC failed to preserve the Dorm Logs that could have explicated some of the stranger features of the events preceding Antonio Kirkland's death. The Dorm Logs would have shown any irregularities in the celling of two unwilling cellmates on July 7, 2017. They would have shown the Dorm count and revealed whether there were open beds in other cells where McGill could have been placed. And perhaps they would have shown why FDC failed to turn the Dorm Logs over to FDLE back in 2017 and why they were in such a rush to destroy them in early 2020, before the purge date.

**C. The Refusal of Defendants to Provide Plaintiff Unredacted Material Facts Denied Plaintiff the Ability to Argue under Rule 404(b)(2)**

Under the facts of this case, the importance of issues like motive, intent, preparation, plan, knowledge, and absence of mistake is extremely high and must be weighed in determining whether Plaintiff can proceed to trial on her excessive force claims. Plaintiff claims a shared, multifaceted, retaliatory purpose among the Defendants and a pattern of events that were part of a retaliatory plan.

In this case, Defendants, after having produced heavily redacted classification records early on in discovery, re-sent the records substantially unredacted so that they could be said to be useful and trustworthy. However, as to Management Information Notification System (MINS) reports (See D.E. 70-4), which are supposed to cover every reportable event in the Department of Corrections, Plaintiffs were told that the Office of Inspector General refuses to produce the records with any

fewer redactions, apparently on the basis they were constrained by law.

Take for example, the MINS report that was written on the incident of the death of Antonio Kirkland at Charlotte C.I., Dorm A on July 10, 2017. (Id. at 1). The first thing that is redacted is a code for the decades-old software that is used, apparently as a "trade secret" although it is certainly no longer a secret and does not interface with any modern software. The second thing is the i.d. of the preparer. Corrections officials wear badges with i.d. numbers visible to anyone who sees them. The third thing that is redacted is the code for "Incident Type." The fourth thing is whether there are injuries (Y/N). The fifth thing is whether there was "Strategic Threat Group" (gang) involvement. The sixth thing is the officers' birthdates.

The seventh category of redactions are most concerning are in the narrative section of the report because they are most likely to cover up material evidence. For instance, "Upon Colonel Morales' arrival, he observed that Inmate Kirkland (the next 21 characters are redacted)." Presumably this was considered Protected Health Information (PHI) under HIPAA regulations. However, Defendants had been given a medical release and the Court had rendered a HIPAA-Qualified Protective Order. Another example is "Sergeant Busic placed Inmate Kirkland in restraints then (19 characters redacted) and could not locate one. (13 characters redacted) arrived and advised Sergeant Busic to (12 characters redacted) and he was placed (4 characters redacted) (9 characters redacted) and taken to (37 characters redacted) (29 characters redacted) security staff. (3 characters redacted) arrived at approximately 1605 hours (21 characters redacted). At approximately 1629 Inmate Kirkland was declared

deceased (7 characters redacted)." Essentially, this redacted narrative makes sense only with the aid of the imagination. Other reports are similar.

If the redactions had been justified as necessary to protect the integrity of the security information and if litigants and the public were called on to "trust" FDC security, then the next fact is all the more meaningful. Missing from the series of MINS reports provided in this exhibit was any report of the July 3, 2017 incident involving the use of force on Antonio Kirkland. Like the Use of Force report itself, this report had been plucked out of the classification record altogether. It was missing from the Kirkland Classification Record produced on March 4, 2022 and the set of MINS report produced on March 17, 2022. It was only "found" seven months later on October 13, 2022, 18 days before the end of discovery. (Exh. 3 at 9).

### D. Plaintiff Would Be Unduly Prejudiced by Denial of the Full and Expedited Discovery Information and Unredacted Records

The redactions and the culling of embarrassing records from the files affected the Plaintiff's ability to collect evidence in this case. With fuller information, Plaintiffs would have posed many more questions to Defendant Velasquez and deposed staff involved in the earlier (long-denied) July 3, 2017, incident. Plaintiffs would have done a Fed.R.Civ.P. 30(b)(6) deposition. Plaintiff would certainly have submitted the video of the 90-minute shower to an expert for a "clean-up" of ambient noise so that the words could be more clearly understood. Plaintiffs first sought these materials and information nearly a year ago. The culling of records and the manner they have been redacted was clearly calculated to obstruct efforts to research the

issues in this case and is part of an overall pattern of stonewalling and delay. Harm done by this pattern of obstruction cannot be undone but should be minimized.

### E. The Sustained Denial of Relevant and Potentially Material Records Constitutes Spoliation as Will Be Further Argued in Limine

The Eleventh Circuit maintains a strong policy of determining cases on the merits. *In re Worldwide Web Sys.*, *Inc.*,  328 F.3d 1291, 1295 (11th Cir. 2003). *Besweets Creations, LLC v. McClain*, No. 19-cv-60138 at *2 (S.D. Fla. 2019).

It is in the interest of the integrity of this process to permit further discovery on the late-produced materials. In addition, should the Court find the information was withheld "with the intent to deprive another party of the information's use in the litigation," the Court may impose the harsher sanctions in Rule 37(e)(2). *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 429-30 (M.D. Fla. 2018).

Whether or not the denial of timely production amounted to spoliation, it was not caused by the Plaintiffs who had a right to rely on the representation that the production of records was complete.

Plaintiff's counsel also requests that defense counsel be sanctioned for this conduct under Rule 26(g), which requires sanctions on the signer who certifies discovery responses and imposes a duty on the attorney to make a reasonable inquiry to ensure redactions are not improper. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997); Fed. R. Civ. P. 26(g) advisory cmte.'s note to 1983 amdmt. The decision to impose sanctions in this instance is mandatory. *Chudasama*, 123 F.3d at 1372 ("Once the court makes the factual determination that a discovery filing was

signed in violation of the rule, it must impose an appropriate sanction."). Defense counsel cannot show his actions were substantially justified or harmless, *Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1268 (M.D. Fla. 2006).

WHEREFORE, Pursuant to Fed.R.Civ.P. 56(d), through this Motion and the Declaration of Plaintiff's counsel, attached hereto, Plaintiff moves this Honorable Court to defer ruling on Defendants' Motions for Summary Judgment until such time as (1) Defendant Velasquez can be re-deposed and Officers Rediker, Rosario, Dischiavo, Loar and designees under Rule 30(b)(6) can be deposed, (2) all MINS are produced unredacted to counsel for Plaintiff or to the Court for review, *in camera*, (3) videos of uses of force on McGill and drug test results after transfer from Charlotte, and (4) such further Orders as justice may require. Plaintiff also requests sanctions as appropriate for attempted concealment of material evidence.

Respectfully submitted,   */s/ James V. Cook*
                                          JAMES V. COOK, ESQ.
                                          Florida Bar Number 0966843
                                          Law Office of James Cook
                                          314 West Jefferson Street
                                          Tallahassee, Florida 32301
                                          (850) 222-8080; 561-0836 fax
                                          cookjv@gmail.com
                                          Attorney for Plaintiff

I CERTIFY that I have conferred in good faith with opposing counsel by exchange of e-mails and opposing counsel objects to the Motion.

I CERTIFY the foregoing was filed electronically on 1/18/23 and that counsel of record are registered to be notified by the CM/ECF electronic mail system:

                                                              *s/James V. Cook*