# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

ANTONIO KIRKLAND, et al.,

    Plaintiffs,

v.                               Case No. 2:21-cv-562-JLB-NPM

RICKY DIXON, et al.,

    Defendants.

_____/

## DEFENDANTS' REPLY TO PLAINTIFFS' REPSONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Dixon, Velasquez, Busic, Fuller-Wilcox, and Pavese, by and through undersigned counsel, hereby file their reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment [Doc. 87] and state the following:

**A. Reply to Plaintiff McGill's Administrative Remedy Response**

In Plaintiffs' response to Defendants' Motion for Summary Judgment, Plaintiff McGill points to a single grievance [Doc. 87, pp.11-12]. In the grievance, McGill alleged there was excessive force used on him on September 13, 2017, at Columbia CI Annex, which is two months after the incident with Kirkland at Charlotte CI. [Doc. 77, Ex.17, Grievance 17-6-41612] ("the grievance"). The remedial action sought by Plaintiff McGill in the grievance was "that someone look into this matter." *Id.*

1

The grievance was referred to and thoroughly investigated by the Office of the Inspector General. The allegations were found to be without merit, and none of the officers involved in that incident have been named as defendants in this lawsuit. [Doc. 77, Ex.19, OIG Investigative Report #17-16452].

Based on the grievance, Plaintiff McGill proceeds as if his administrative remedies were exhausted with respect to his claims. For example, some of these allegations include:

a. "Officers have a tradition of setting up fights between inmates, despite their unwillingness, including fights to the death, called, "Fight Club" or "Gladiator School" for officers' amusement and sometimes bets are placed on the inmate combatants." [Doc. 49, ¶¶ 12, 103(a), and 110(a)].

b. "[McGill] didn't want to be placed in the cell with Kirkland and believed that [Kirkland] was in a dangerous and volatile mental state, but he was forced by the officers to share the cell with Kirkland." [Doc. 49, ¶ 16].

c. "On July 10, 2017, prison staff stepped up their campaign to instigate a fight between the two inmates while McGill tried to keep Kirkland cool." [Doc. 49, ¶ 27]. Corrections staff called, out, "Only one of you is coming out." "One of you needs to stop breathing." And "One of you needs to kill the other." [Doc. 49, ¶ 28]. "At the urging of the staff, Kirkland tried to claw McGill's eyes out." [Doc. 49, ¶ 30].

d. Defendants were "aware of the severe physical abuse of McGill and Kirkland, and fail[ed] to intervene to stop the abuse, though able." [Doc. 49, ¶ 115(e)].

e. "After the event, prison supervisors, including Col. Johnny Morales, were anxious to get Inmate McGill to sign off on the official version of events." [Doc. 49, ¶ 63].

f. "The 'white shirts' (administrators) came to McGill's cell and told him he needed to sign a version of the incident that would clear the officers." [Doc. 49, ¶ 64].

g. "McGill refused to write anything. The officers present threatened to move him far away from his family. Officers tried to plant a knife on him." [Doc. 49, ¶ 66].

These allegations demonstrate the lengths Plaintiff McGill now asks the Court to construe the grievance as fairly putting Defendants on notice of the above allegations. [Doc. 87, pp.11-13]. This grievance does not do so and cannot satisfy his exhaustion requirements.

Plaintiff cites *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010), for the proposition that the grievance constituted exhaustion with respect to all allegations in this lawsuit. However, the *Parzyck* court held that an inmate is "not required to initiate another round of the administrative grievance process on the *exact same issue* each time another request for an orthopedic consultation was denied." *Id.* (emphasis added).

Here, the case at hand is distinguishable. The grievance does not allege retaliation tied to the underlying conduct of this case. Plaintiff McGill argues that the court should infer this to be a grievance of retaliation based on "the timing and

3

the retaliatory tone." [Doc. 87, p.12]. This argument does not hold up because the grievance comes two months after the underlying incident of this case. It also names six other officers who are not defendants here, nor have they been deposed to obtain any evidence tying them to the underlying issues here. This is the single grievance that Plaintiff McGill relies on to satisfy his exhaustion requirement, yet it is silent regarding the specific claims he now brings from the incident with Kirkland.

Instead, Defendants argue that *Arias v. Perez*, 758 F. App'x 878 (11th Cir. 2019) is the appropriate precedent. In *Arias*, the inmate filed a grievance requesting to be placed in protective management. *Id.* at 881. This request was approved, and the inmate was transferred to a special unit. *Id.* Without any other grievances, the inmate later sued the prison on a failure-to-protect theory. The court found that the "claim that [the Inmate] suffered an Eighth Amendment violation when [the Officer] failed to protect him is distinct from the claim that he should be transferred to a protective management unit. [The Inmate's] filings addressed the latter—indeed, he ultimately received precisely the relief that he requested—but not the former." *Id.* at 882. The court held that the inmate's "injuries were not simply 'the continuation of a problem already raised'; they were a separate, even if related, problem." *Id.* (quoting *Parzyck*, 627 F.3d at 1219). The court's rationale was that "[i]t would subvert the PLRA's purpose of granting prison authorities 'time and opportunity to address complaints internally before allowing the initiation of a federal case,' if a

4

prison could grant all the relief a prisoner asked for and yet still find itself subject to suit." *Id.* (quoting *Porter v. Nussle*, 534 U.S. 516, 525 (2002)). The case at hand shares at least two important similarities with *Arias*. First, the allegations raised in the complaint are completely distinct from the allegations raised in the grievance. Secondly, Plaintiff McGill received the remedy he requested (*i.e.*, a formal investigation) in the only grievance he now invokes to show that his administrative remedies were exhausted.

In conclusion, Plaintiff McGill has not exhausted his administrative remedies with respect to the allegations made in this lawsuit because the grievance he relies on did not "alert prison officials to problems and allow prison officials time and opportunity to address complaints internally before seeking judicial intervention." *Berry v. Keith*, 2021 WL 1561493, at *6 (M.D. Fla. 2021).

### B. Reply to Arguments by Plaintiffs' Experts

Plaintiffs' expert, Dr. Kris Sperry, gave his opinion which pointed out the severe blockages affecting both of Kirkland's main coronary arteries as being what put Kirkland at "significant risk for the evolution of a sudden lethal cardiac arrhythmia." [Doc. 87, p. 6]. Plaintiffs seem to suggest that this should have prevented corrections officers from using chemical agents to deter his armed attempted murder of McGill.

Plaintiffs fail to accept that chemical agents would have been used in *any* situation, regardless of an inmates health conditions, since the officers were responding to a spontaneous use of force incident. [Doc. 77, Ex. 6, Paul Pavese Deposition, 12:13-16] ("In a spontaneous use of force, we do not check [an inmate's medical records]. [M]y job was to make sure Inmate Kirkland stops attacking Inmate McGill."); *See also* [Doc. 77, Ex. 7, Stephen Busic Deposition, 29:19-30:1] (same).

With respect to the pepper spray used by officers, Sperry offers his opinion, made of pure speculation and completely out of his realm of expertise, that "only three to four spray bursts are necessary to achieve the desired effect." [Doc.78, Ex. 4, Sperry Report at 3]. Sperry also summarily dismisses the causal role played by the drugs in the decedent's system and speculates on what might have been the case if he had been rendered aid a few minutes before he was. [Doc. 87, Ex. 6, Sperry Rebuttal Report at 2]. In a case with a similar causation question complicated by the decedents drug use, found:

> Dr. Sperry seeks to testify about: what would have occurred if Defendant had immediately ordered [the decedent] transported to a hospital; the medical treatment Dr. Sperry believes should have been provided to [the decedent] while [the decedent] was alive; when those treatments should have been provided; and whether those treatments would have prevented [the decedent's] death.

*Griffin v. Coffee Cty.,* 2022 U.S. Dist. LEXIS 101639, at *9 (S.D. Ga. 2022). The court ultimately held that "Dr. Sperry lacks the qualifications to opine on treatment for a methamphetamine overdose or the effect of any treatment on a patient's

6

outcome." *Id.* at 10. The court also held that Dr. Sperry's "review of medical literature and application of his experience" was insufficiently reliable because "Dr. Sperry does not have experience in treating drug overdoses or determining whether early intervention would have prevented a drug overdose." *Id.* at 18-19.

Therefore, Plaintiff Kirkland does not create a genuine issue with respect to the issues of excessive force or cause of death by invoking the conclusory, speculative, and unreliable testimony of Dr. Sperry.

Wherefore, Defendants respectfully request this Court grant their Motion for Summary Judgment.

Respectfully submitted,

*/s/ Thomas Buchan*
Thomas Buchan
Florida Bar No. 1010923
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
(850) 877-7776
Tom@jsh-pa.com
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I CERTIFY that a true and correct copy of the foregoing has been served on all counsel of record by CM/ECF this 20th day of January 2023.

*/s/ Thomas Buchan*
Thomas Buchan

7